# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                          No. CR 16-1613 JB

ANTHONY RAY BACA, a.k.a. "Pup,"
CHRISTOPHER GARCIA, SERGIO
LOYA RORDIGUEZ, a.k.a "Churro,"
MANUEL BENITO, a.k.a. "Panther,"
VINCENT GARDUÑO a.k.a. "Fatal,"
MANDEL LON PARKER, a.k.a. "Chuco,"
DANIEL ARCHULETA, a.k.a. "Smurf,"
DANIEL SANCHEZ, a.k.a. "Dan Dan,"
ANTHONY CORDOVA, a.k.a. "Antone,"
and ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun,"

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the United States' Sealed Motion Regarding Attorney Conflict, filed April 30, 2018 (Doc. 599)("Motion"). The primary issue is whether the Court must disqualify Billy Blackburn, who represents Defendant Arturo Arnulfo Garcia, because Mr. Blackburn represented James Garcia -- a potential witness for Plaintiff United States of America -- in a 1995 state-court prosecution for murder, evidence tampering, and firearm possession. The Court will not disqualify Mr. Blackburn, because Mr. Blackburn can continue to represent A. Garcia without violating his continuing ethical duties to J. Garcia as long as Mr. Blackburn does not cross examine J. Garcia. The Court will appoint an additional attorney to represent A. Garcia who can zealously cross examine J. Garcia so that Mr. Blackburn will not have to do so. Even if Mr. Blackburn's prior representation of J. Garcia implicates A. Garcia's constitutional right to the effective assistance of counsel, A. Garcia's knowing and intelligent

waiver means that Mr. Blackburn does not need to withdraw from this case. Accordingly, the Court grants the Motion in part and denies it in part, and the Court will not disqualify Mr. Blackburn if the Court can secure an additional attorney for A. Garcia and A. Garcia waives any constitutional issues.

## FACTUAL BACKGROUND

The Court takes its background facts from the Superseding Indictment, filed March 9, 2017 (Doc. 372)("Indictment"). The Court does not set forth these facts as findings or the truth. The Court recognizes that the factual background is largely the United States' version of events and that the Defendants are all presumed innocent.

This case deals with the crimes that the Syndicato de Nuevo Mexico ("SNM") allegedly committed through its members. See Indictment ¶¶ 1, 3, at 1-2. The SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including, murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." Indictment ¶ 1, at 2. The SNM constitutes an enterprise "as defined in Title 18, United States Code, Sections 1959(b)(2) and 1961(4), that is, a group of individuals associated in fact that engaged in, and the activities of which affected interstate and foreign commerce." Indictment ¶ 2, at 2. The enterprise is "an ongoing organization whose members/prospects/associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise." Indictment ¶ 2, at 2.

The SNM is a prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage. See Indictment ¶ 3, at 2. During the riot,

thirty-three inmates were killed, and over 200 were injured.  <u>See</u> Indictment ¶ 3, at 2.  After the PNM riot, the SNM expanded throughout the state's prison system and has had as many as 500 members.  <u>See</u> Indictment ¶ 4, at 2.  The SNM now has approximately 250 members, and "a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members." Indictment ¶ 4, at 2-3.  The SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system.  <u>See</u> Indictment ¶¶ 3, 5, at 2-3.  Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and the profit from narcotics trafficking.  <u>See</u> Indictment ¶ 5, at 3.  Members who fail "to show continued loyalty to the gang" may be assaulted or murdered.  Indictment at 4.  The SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities.  <u>See</u> Indictment ¶ 6, at 3.  If another gang does not abide by the SNM's demands, the SNM will assault or kill one of the other gang's members to show its power.  <u>See</u> Indictment ¶ 6, at 3.  The SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. <u>See</u> Indictment ¶ 7, at 4.  The SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others."  Indictment ¶ 7, at 4.  "Similarly, a member of the SNM Gang is expected to confront and attack any suspected law enforcement informants, cooperating witness[es], homosexuals, or sex offenders."  Indictment ¶ 8, at 4.  To achieve its purpose of maintaining power, the SNM uses intimidation, violence, threats of violence, assault, and murder.  <u>See</u> Indictment ¶¶ 6-8, at 3-4.  The SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers.  <u>See</u> Indictment ¶ 7, at 4.  The SNM's recent activities in a

conspiracy to murder high-ranking New Mexico Corrections Department officials inspired the Federal Bureau of Investigation's present investigation. See United States v. Garcia, 221 F. Supp. 3d 1275, 1277 (D.N.M. 2016)(Browning, J.). The other relevant facts giving rise to this case are as follows.

**FINDINGS OF FACT**

Rule 12(d) of the Federal Rules of Criminal Procedure states that, "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record." Fed. R. Crim. P. 12(d). There are factual issues involved in deciding the Motion. Accordingly, the Court makes the following findings of fact in accordance with rule 12(d).

1.      In June, 1994, J. Garcia shot and killed a man named Tony Lucero; he then hid the handgun that he used. See State v. Garcia, 94-CR-1507, Grand Jury Indictment at 1-2 (Second Judicial District Court, County of Bernalillo, State of New Mexico), filed in federal court April 30, 2018 (Doc. 599-1); State v. Garcia, 94-CR-1507, Verdict Forms at 1-4 (Second Judicial District Court, County of Bernalillo, State of New Mexico), filed in federal court April 30, 2018 (Doc. 599-1)("State Verdict").

2.      In 1995, a jury convicted J. Garcia of Second Degree Murder, Tampering with Evidence, and Using a Firearm in Commission of Second Degree Murder. See State v. Garcia, 94-CR-1507, Record of Trial at 1 (Second Judicial District Court, County of Bernalillo, State of New Mexico), filed in federal court April 30, 2018 (Doc. 599-1)("State Trial Record"); State Verdict at 1-4.

3.      Mr. Blackburn represented J. Garcia in that case. See State Trial Record at 1.

4.      The murder in State v. Garcia was not SNM related, but J. Garcia was a member of a street gang at that time. See United States v. DeLeon, No. CR 15-4268, Transcript of

Motion Proceedings at 16:4-6 (taken April 4, 2018)(Blackburn), filed April 24, 2018 (Doc. 2150)("April Tr.")("[The murder] involves a gang matter, of which wasn't SNM, but for which he went to prison on."); id. at 146:25-147:1 (Blackburn); id. at 147:3-5 (Beck)("[W]e don't take the position that this was an SNM-related murder.").[1]

5.       The state court imposed a twenty-four year sentence.  See State v. Garcia, 94-CR-1507, Judgment, Sentence and Commitment at 2 (Second Judicial District Court, County of Bernalillo, State of New Mexico), filed in federal court April 30, 2018 (Doc. 599-1).

6.       In this case, Mr. Blackburn represents A. Garcia.  See CJA 20: Appointment of Attorney Billy R. Blackburn for Arturo Arnulfo Garcia by District Judge James O. Browning, filed March 10, 2017 (Doc. 375)(text-only order).

7.       The United States intends to call J. Garcia as a trial witness.  See Motion at 2.

8.       J. Garcia will not waive any conflicts of interest that arise as a result of Mr. Blackburn's present representation of A. Garcia.  See April Tr. at 279:19-20 (Court).

9.       Scott Davidson -- A. Garcia' second court-appointed attorney -- may be privy to confidential information relating to Mr. Blackburn's 1995 representation of J. Garcia.

10.       The Court plans to appoint a third attorney -- Laura Udall -- to represent A. Garcia and cross examine J. Garcia.

11.       The United States believes that more than ten years have passed since J. Garcia was released from confinement for his 1995 conviction and that rule 609(b) of the Federal Rules of Evidence consequently renders evidence of that conviction inadmissible to attack J. Garcia's

---

[1]Mr. Blackburn represents A. Garcia in both this case and in United States v. DeLeon, No. CR 15-4268 (D.N.M.), and the prosecution team in this case and in United States v. DeLeon are one and the same.  Accordingly, the Court heard oral argument in its United States v. DeLeon hearings that is relevant to the Motion even though J. Garcia did not testify in that case.

character for truthfulness, so the United States does not plan on eliciting that conviction during J. Garcia's direct examination.

12. When calling witnesses who are convicted criminals in <u>United States v. DeLeon</u>, the United States has consistently offered their convictions into evidence during its direct examinations. <u>See</u>, <u>e.g.</u>, <u>United States v. DeLeon</u>, No. CR 15-4268, Transcript of Trial Proceedings at 10:12-11:10 (taken February 16, 2018)(Castellano, Martinez), filed April 3, 2018 (Doc. 2035)("I want to go over some of your criminal history with you."); <u>United States v. DeLeon</u>, No. CR 15-4268, Transcript of Trial Proceedings at 9:24-10:1 (taken February 8-9, 12, 2018)(Armenta, Castellano), filed April 3, 2018 (Doc. 2036)("Now, how many convictions do you have for drug trafficking?"); <u>United States v. DeLeon</u>, No. CR 15-4268, Transcript of Trial Proceedings at 18:15-18 (taken February 14, 2018)(Archuleta, Beck), filed April 3, 2018 (Doc. 2037)("Is this your judgment, sentence, and commitment when you were sentenced for involuntary manslaughter?"); <u>id.</u> at 20:3-8 (Archuleta, Beck); <u>id.</u> at 20:25-21:3 (Archuleta, Beck); <u>id.</u> at 21:11-21 (Archuleta, Beck); <u>United States v. DeLeon</u>, No. CR 15-4268 at 12:21-13:7 (taken February 7-8, 2018)(Armijo, Rodriguez), filed April 3, 2018 (Doc. 2041)("Now, I want to talk a little bit about your criminal history.").

13. At trial, the United States will likely attempt to elicit testimony from J. Garcia regarding SNM narcotics and firearms deals, circa 2011 and 2012, involving Defendant Sergio Loya Rodriguez, <u>see</u> Indictment at 35, 37, and the murder of an SNM gang member, <u>see</u> <u>id.</u> at 35.

14. The United States might also attempt to elicit testimony from J. Garcia about conversations he had with SNM gang member Edward Troup, which related to the murders of SNM members Freddy Sanchez and Frank Castillo. <u>See</u> Indictment at 18, 27; <u>United States v.</u>

DeLeon, No. CR 15-4268, Interview at 2-3, filed March 9, 2018 (Doc. 1909-1).

**PROCEDURAL BACKGROUND**

On March 9, 2017, a federal Grand Jury in the District of New Mexico returned a Indictment in this case charging A. Garcia in Count 1 with Racketeering Conspiracy in violation of 18 U.S.C. § 1962(d). <u>See</u> Indictment ¶ 1, at 1-2. The Indictment alleges that A. Garcia was an SNM gang member and leader involved in various overt acts, including, among others: (i) ordering the Sanchez murder; (ii) inducting Rodriguez into the SNM; and (iii) facilitating narcotics deals. <u>See</u> Indictment at 24, 26-27, 30, 32. On March 10, 2017, the Court appointed Mr. Blackburn as A. Garcia's attorney. <u>See</u> CJA 20: Appointment of Attorney Billy Blackburn for Arturo Arnulfo Garcia by District Judge James O. Browning, filed March 10, 2017 (Doc. 375)(text-only order). The trial is set to begin July 9, 2018. <u>See</u> Third Scheduling Order at 2, filed July 7, 2017 (Doc. 448).

1.      **The Motion**.

The United States represents that it will call J. Garcia as a witness in this trial. <u>See</u> Motion at 2. It asserts that, because it is aware that Mr. Blackburn represented J. Garcia in a previous case, it has a duty to bring to this potential or actual conflict of interest to the Court's attention. <u>See</u> Motion at 2-3. The United States also asserts that the Court has two duties when confronted with a potential or actual conflict of interest: (i) to inquire into the potential or actual conflict; and (ii) to disqualify the conflicted attorney or to seek the affected defendant's waiver if the inquiry reveals a potential or actual conflict. <u>See</u> Motion at 3.

The United States argues that Mr. Blackburn's previous representation of J. Garcia may create an actual conflict in this case. <u>See</u> Motion at 7. It contends that such conflict could occur, for example, if Mr. Blackburn has to cross-examine J. Garcia, "and the scope of that cross-

examination could include the murder to which James Garcia was convicted of while Mr. Blackburn represented him." Motion at 7. Thus, according to the United States, Mr. Blackburn may not be able to zealously advocate for A. Garcia. See Motion at 7.

The United States also argues that Mr. Blackburn's representation may not be able to continue, even if A. Garcia consents. See Motion at 7-8 (citing N.M. R. Prof'l Conduct 16-106 to 07, 16-109). Although it acknowledges that the New Mexico Rules of Professional Conduct do not always determine a conflict-of-interest inquiry's outcome, the United States contends that Mr. Blackburn's present representation of A. Garcia implicates Mr. Blackburn's duty to maintain J. Garcia's confidences under N.M. R. Prof'l Conduct 16-106. See Motion at 8-9 ("The strictures of rule 16-106, confidentiality of information . . . may prohibit Mr. Blackburn from representing Defendant in the instant case.").[2] The United States concedes that it does not know what relevant confidential information Mr. Blackburn may have about J. Garcia. See Motion at 9.

The United States also contends that, under N.M. R. Prof'l Conduct 16-107, Mr. Blackburn's conflict of interest may be so severe that it is not waivable. See Motion at 9-10. Specifically, it argues that a lawyer cannot "reasonably believe" that he can give competent and diligent representation when one client is cooperating against the other. Motion at 10. The United States adds that N.M. R. Prof'l Conduct 16-109, the rule about conflicts with former clients, demonstrates that there may still be ethical issues even though Mr. Blackburn no longer represents J. Garcia. See Motion at 10.

---

[2]The United States ought to cite N.M. R. Prof'l Conduct 16-109(c) for this proposition, because rule 16-106 addresses an attorney's duties to current clients, but Mr. Blackburn does not currently represent J. Garcia. See United States' Unopposed Notice of Removal of Witness at 1, filed April 6, 2018 (Doc. 2084).

The United States argues that, even if there is not an actual conflict of interest, there may be a potential conflict of interest warranting disqualification. See Motion at 11. It argues, for example, that, if J. Garcia testifies, Mr. Blackburn will not be able to cross examine J. Garcia about his street-gang membership, because Mr. Blackburn acquired information about J. Garcia's street-gang membership while representing him. See Motion at 11 n.5. The United States adds that, if the Court concludes that the conflict is just a potential conflict, rather than an actual conflict, the Court must hold a hearing so that the Court may actively participate in A. Garcia's waiver decision. See Motion at 13-15.

**2.     The April 4, 2018 Hearing.**

On the eve of trial in United States v. DeLeon, the United States argued that Mr. Blackburn should be disqualified in both United States v, DeLeon and in this case unless evidence regarding the prosecution in which Mr. Blackburn represented J. Garcia "is not going to be admitted into evidence." April Tr. at 22:23-23:2 (Armijo).[3] Mr. Blackburn expressed his belief that J. Garcia's conviction would be admissible to impeach J. Garcia if he takes the stand. See April Tr. at 58:7 (Blackburn)("[J. Garcia] can be impeached on the 1994 conviction."). See also id. at 141:5-8 (Beck)("I believe that Mr. James Garcia was released from prison on that murder in 2009. So his release date is still within, I think, the last 10 years for that murder."). Mr. Blackburn did not think J. Garcia would waive the conflict. See April Tr. at 145:20-23 (Blackburn); id. at 146:9-10 (Blackburn).[4] After some colloquy about Mr. Blackburn's prior representation of J. Garcia, the Court noted that the prior representation might not be

---

[3]Whether Mr. Blackburn could represent A. Garcia notwithstanding his prior representation of J. Garcia, became moot, vis-à-vis United States v. Deleon, when the United States filed a notice indicating that it would not call J. Garcia as a witness in that case.

[4]J. Garcia does not waive the conflict. See April Tr. at 279:19-20 (Court).

substantially related to Mr. Blackburn's current representation of A. Garcia, because the prior representation was not related to the SNM. See April Tr. at 149:1-4 (Court). The Court remarked that, if the two representations are not substantially related, it may not have to disqualify Mr. Blackburn. See April Tr. at 149:1-4 (Court).

## LAW REGARDING ETHICAL DUTIES TO FORMER CLIENTS

In criminal cases, the United States District Court for the District of New Mexico requires attorneys to "comply with the Rules of Professional Conduct adopted by the Supreme Court of the State of New Mexico, unless modified by local rule or Court order." D.N.M. LR-Cr R. 57.2. Those rules state: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." N.M. R. Prof'l Conduct 16-109(A). "The scope of a 'matter' for the purposes of this rule depends on the facts of a particular situation or transaction." N.M. R. Prof'l Conduct 16-109 cmt. 2. Whether a lawyer was involved in a particular matter "can also be a question of degree." N.M. R. Prof'l Conduct 16-109 cmt. 2. "The underlying question" when determining whether a lawyer is disqualified because the lawyer represented a former client in the same matter "is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of side." N.M. R. Prof'l Conduct 16-109 cmt. 2.

The New Mexico Rules of Professional Conduct define "substantially related" matters:

Matters are "substantially related" for purposes of this rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter. . . . Information that has been disclosed to the public or to

other parties adverse to the former client ordinarily will not be disqualifying. Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related. . . . A former client is not required to reveal the confidential information learned by the lawyer in order to establish a substantial risk that the lawyer has confidential information to use in the subsequent matter. A conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services.

N.M. R. Prof'l Conduct 16-109 cmt. 3. Phrased alternatively, a "substantial relationship exists 'if the factual contexts of the two representations are similar or related.'" Cole v. Ruidoso Mun. Schs., 43 F.3d 1373, 1384 (10th Cir. 1994)(quoting Smith v. Whatcott, 757 F.2d 1098 1100 (10th Cir. 1985)). "An objective standard is used when determining whether the lawyer reasonably could believe that the representation of a client with interests adverse to those of another client would not adversely affect the lawyer's relationship with the other client." In re Stein, 2008-NMSC-013, ¶ 22, 177 P.3d at 519. Even when a former client's representation is not substantially related to "the subject matter of [a current client's] trial," the two representations can still be substantially related when the current client's "defense would necessarily involve refuting [the former client's] testimony." Pickney v. United States, 851 A.2d 479, 487-88 (D.C. Ct. App. 2004).

In addition to restricting a lawyer's ability to participate in certain matters connected to their representation of a former client, the New Mexico Rules of Professional Conduct state:

A lawyer who has formerly represented a client in a matter shall not thereafter:

(1)     use information relating to the representation to the disadvantage of the former client except as these rules would permit or require with respect to a client or when the information has become generally known.

(2)     Reveal information relating to the representation except as these

rules would permit or require with respect to a client.

N.M. R. Prof'l Conduct 16-109(C). "The New Mexico Supreme Court has disbarred attorneys pursuant to this rule where, in part, an attorney's use of information related to his prior representation of a client involved defrauding that client out of more than $100,000.00 in the course of representation regarding a will and testament." Abila v. Funk, 2016 WL 5376323, at *6 (D.N.M. Sept. 20, 2016)(Browning, J.)(citing In re C'de Baca, 1989-NMSC-070, ¶¶ 1-7, 782 P.2d 1348). The Court has disqualified an attorney in a Violent Crimes in Aid of Racketeering, 18 U.S.C. § 1959 case pursuant to the New Mexico ethical rules, because the attorney had previously represented a government witness in an affiliated murder case. See United States v. DeLeon, 291 F. Supp. 3d 1283, 1311-12 (D.N.M 2018)(Browning, J.).

**LAW REGARDING THE EFFECTIVE ASSISTANCE OF COUNSEL AND ATTORNEY CONFLICTS OF INTEREST**

The Sixth Amendment of the Constitution of the United States of America grants criminal defendants the right to the effective assistance of counsel. One aspect of the effective assistance of counsel is the absence of conflicts of interest. The Sixth Amendment also grants defendants the right to counsel of their choice. When the right to conflict-free counsel is in tension with the right to counsel of one's choice, a defendant may knowingly and voluntarily waive the former to vindicate the latter. A court, however, has discretion to reject such a waiver.

**1.    The Right to Conflict-of-Interest-Free Counsel.**

The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. vi. Furthermore,

> [t]hat a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command . . . . An

accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.

Strickland v. Washington, 466 U.S. 668, 685 (1984). "Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest." Strickland v. Washington, 466 U.S. at 688. "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 348 (1980). A violation of applicable ethical rules, however, does not necessarily amount to an actual conflict. See United States v. Gallegos, 39 F.3d 276, 279 (10th Cir. 1994)("[I]t is apparent also that a violation of the rules [of professional conduct] will not in itself constitute a constitutional violation under *Cuyler* [v. Sullivan] and related cases."). Instead, "[a]n actual conflict exists when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client." United States v. Bolivar, No. CIV 12-0128, 2012 WL 3150430, at *11 (D.N.M. July 20, 2012)(Browning, J.)(quoting Perillo v. Johnson, 205 F.3d 775, 781 (5th Cir. 2000)). When an actual conflict of interest significantly impacts defense counsel's performance, reversal is automatic; no further showing of prejudice is required. See Strickland v. Washington, 466 U.S. at 692.

Reversal is also automatic when a defendant objects to multiple representation -- i.e., one lawyer representing multiple defendants in a single proceeding -- and a trial judge neither acts to remove the potential conflict of interest by appointing separate counsel nor "take[s] adequate steps to ascertain whether the risk [is] too remote to warrant separate counsel." Holloway v. Arkansas, 435 U.S. 475, 484 (1978). See Mickens v. Taylor, 535 U.S. 162, 168 (2002)(Scalia,

J.)("*Holloway* [v. Arkansas] thus creates an automatic reversal rule only where defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict.").  See also United States v. Perez, 325 F.3d 115, 125 (2d Cir. 2003)("[A]n attorney has a potential conflict of interest if 'the interests of the defendant may place the attorney under inconsistent duties at some time in the future.'" (quoting United States v. Kliti, 156 F.3d 150, 153 n.3 (2d Cir. 1998))).

Although "a possible conflict inheres in almost every instance of multiple representation," a trial court has an "affirmative duty to inquire into the propriety of multiple representation" only when it "knows or reasonably should know that a particular conflict exists." Cuyler v. Sullivan, 446 U.S. 335, 346-48 (1980).  See United States v. Rogers, 209 F.3d 139, 143 (2d Cir. 2000)("[A] court that learns of a possible conflict must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." (internal citations omitted)).  If a trial court fails to undertake that inquiry, however, reversal is not automatic.  See Mickens v. Taylor, 535 U.S. at 173-74 ("[S]ince the trial court's failure to make the *Sullivan*-mandated inquiry does not reduce the petitioner's burden of proof; it was at least necessary, to void the conviction, for petitioner to establish that the conflict of interest adversely affected his counsel's performance.").  When the government is aware of a conflict of interest, it "has a duty to bring it to the court's attention and, if warranted, move for disqualification."  United States v. Migliaccio, 34 F.3d 1517, 1528 (10th Cir. 1994).  Defense counsel has a similar duty.  See Cuyler v. Sullivan, 446 U.S. at 346 ("Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial.").

"These principles concerning conflicts of interest are not restricted to cases of joint

representation of co-defendants at a single trial." United States v. Winkle, 722 F.2d 605, 610 (10th Cir. 1983). "[I]n a case of joint representation of conflicting interests the evil -- it bears repeating -- is in what the advocate finds himself compelled to *refrain* from doing," Holloway v. Arkansas, 435 U.S. at 490 (emphasis in the original), and that same evil "is a potential problem in cases where a defendant's attorney previously represented a Government witness," United States v. Winkle, 722 F.2d at 610. Accordingly, the United States Court of Appeals for the Tenth Circuit was "persuaded by the views expressed in *Ross v. Heyne,* 638 F.2d 979, 983 (7th Cir. 1980), that an actual conflict would arise where defense counsel is unable to cross-examine a Government witness effectively because the attorney also represented the witness." United States v. Winkle, 722 F.2d at 610. See Ross v. Heyne, 638 F.2d 979, 983 (7th Cir. 1980)("An actual conflict would arise where defense counsel is unable to cross-examine a prosecution witness effectively because the attorney also represented the witness."); id. ("The problem that arises . . . is that the attorney may have privileged information obtained from the witness that is relevant to cross-examination, but which he refuses to use for fear of breaching his ethical obligation to maintain the confidences of his client."). The Tenth Circuit, accordingly, concluded that it "should apply the conflicts principles from the cases of multiple representation of defendants here where the defense counsel in this criminal trial had represented the principal Government witness in litigation with a factual relationship to some issues in this criminal case," such that, "if the defendant can show that his attorney's previous representation of the witness adversely affected the adequacy of the defendant's representation, then defendant need not demonstrate prejudice to obtain relief." United States v. Winkle, 722 F.2d at 610.

There is not, however, a "per se rule prohibiting representation of the defendant by counsel who has previously represented a government witness in a related case." United States

v. Bowie, 892 F.2d 1494, 1502 (10th Cir. 1990). Instead, a court must determine "whether an actual conflict adversely affected defense counsel's performance -- that is, a conflict existed that might have foreclosed a specific and seemingly valid or genuine strategy or tactic in the handling of th[e] witness." United States v. Bowie, 892 F.2d at 1502. Additionally, a court does not need to make that determination if "the *witness* waived any attorney-client privilege that might have restricted defense counsel's cross-examination," or if the "*defendant* had knowledge of his counsel's prior representation of the government witness and waived his right to counsel free of such conflicts." United States v. Bowie, 892 F.2d at 1502 (emphasis in original). See Church v. Sullivan, 942 F.2d 1501, 1512 (10th Cir. 1991)("On remand, the district court should determine whether either of two waivers occurred because if Green 'waive[d] his attorney-client privilege, then any potential conflict is removed[,]' and further, Church may have 'waived his right to counsel free of such conflicts.'" (alterations in original)(quoting United States v. Bowie, 892 F.2d at 1502)). It is worth noting, however, that, while a defendant's waiver suffices, even without a witness' waiver, with respect to the Sixth Amendment's effective-assistance-of-counsel guarantee, a violation of professional ethical rules can still occur. See United States v. Gallegos, 39 F.3d at 279 (considering the application of ethical rules to an ineffective-assistance-of-counsel claim and stating that "[i]t is apparent that some elements therein bear on the constitutional issue," but concluding that "it is apparent also that a violation of the rules will not in itself constitute a constitutional violation under *Cuyler* [v. Sullivan] and related cases").

The Court of Appeals of the District of Columbia has laid out a trial court's analysis when determining whether "a potential conflict reaches the point at which disqualification is warranted" in the context of successive representation:

[T]he trial court should "examine whether the subject matter of the first

representation is substantially related to that of the second," whether "the conflict could cause the defense attorney improperly to use privileged communications in cross-examination," and whether "the conflict could deter the defense attorney from intense probing of the witness on cross-examination to protect privileged communications with the former client.

Pinkney v. United States, 851 A.2d at 487 (quoting United States v. Ross, 33 F.3d 1507, 1523 (11th Cir. 1994)). See United States v. Roach, 912 F. Supp. 2d 1153, 1172-73 (D.N.M. 2012)(Browning, J.)(applying Pinkney v. United States). "When a district court finds that counsel has a conflict of interest, real or potential, it retains substantial latitude to disqualify counsel." United States v. McKeighan, 685 F.3d at 968 (quoting United States v. Collins, 920 F.2d at 627). The Seventh Circuit has held that, before disqualifying counsel based on a potential conflict, the district court should "evaluate (1) the likelihood the conflict will actually occur; (2) the severity of the threat to counsel's effectiveness; and (3) whether there are alternative measures available other than disqualification." United States v. Turner, 594 F.3d 946, 952 (7th Cir. 2010). A district court's ruling regarding a defendant's right to counsel is reviewed on appeal for abuse of discretion. See United States v. McKeighan, 685 F.3d at 968. See also Wheat v. United States, 486 U.S. at 164 ("The evaluation of the facts and circumstances regarding a defendant's right to counsel must be left primarily to the informed judgment of the trial court.").

The Court has previously concluded that an attorney did not have an actual or a serious potential conflict of interest in representing a husband in criminal case when the attorney had previously represented both a husband and wife in a civil case. See United States v. Roach, 912 F. Supp. 2d 1153, 1171-72 (D.N.M. 2012). Of particular importance to the Court was that the attorney representing the husband had disclosed to the wife's new attorney all information he had

learned during the course of his civil representation, and both attorneys represented that they did "not see any potential conflict of interest arising down the road." United States v. Roach, 912 F. Supp. 2d at 1171. The Court has also determined that no disqualifying conflict existed where there was only a possibility that an attorney's former client would testify against her current client, and because the former representation was "unrelated to the charges in this case." See United States v. Bolivar, 2012 WL 3150430, at *13 (D.N.M. July 20, 2012)(Browning, J.)("That the cases are unrelated provides a strong basis for determining that any potential conflict is not so serious as to require disqualification.').

       **2.**        **The Right to Counsel of One's Choice.**

The "essential aim" of the Sixth Amendment "is to guarantee an effective advocate for each criminal defendant." Wheat v. United States, 486 U.S. at 159. Part of that guarantee is the defendant's right to representation by the counsel of their choice. See United States v. McKeighan, 685 F.3d 956, 966 (10th Cir. 2012)(stating that the Sixth Amendment "guarantee includes the 'right to be represented by an otherwise qualified attorney **whom the defendant can afford to hire**, or who is willing to represent the defendant'" (emphasis added)(quoting Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624-25 (1989))). See also United States v. Gonzalez-Lopez, 548 U.S. 140, 144 (2006)(Scalia, J.)("[A]n element of [the Sixth Amendment] right is the right of a defendant **who does not require appointed counsel** to choose who will represent him." (emphasis added)). Wrongly depriving a defendant of chosen counsel's representation, which requires reversal no matter whether the error prejudiced the defendant. See United States v. McKeighan, 685 F.3d at 966 (quoting United States v. Gonzalez-Lopez, 548 U.S. at 146-50).

The Supreme Court of the United States of America's precedent indicates that indigent

defendants are unable to choose their counsel. See Caplin & Drysdale, Chartered v. United States, 491 U.S. at 624 ("Petitioner does not, nor could it defensibly do so, assert that impecunious defendants have a Sixth Amendment right to choose their counsel."). See also Luis v. United States, 136 S. Ct. 1083, 1089 (2016)(Breyer, J.)(plurality opinion)("[A]n indigent defendant, while entitled to adequate representation, has no right to have the Government pay for his preferred representational choice."); United States v. Gonzalez-Lopez, 547 U.S. at 144 ("We have previously held that an element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him."). Consequently, indigent criminal defendants "have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts." Caplin & Drysdale, Chartered v. United States, 491 U.S. at 624. That conclusion has received significant academic criticism. See, e.g., Janet Moore, The Antidemocratic Sixth Amendment, 91 WASH. L. REV. 1705, 1707 (2016)("On hearing that indigent defendants have no right to choose their lawyers, the Chief Justice [John Roberts] asked, 'Why not?' The correct answer is that there is no good reason to discriminate against poor people in the vindication of this fundamental constitutional right." (quoting United States v. Gonzalez-Lopez, Transcript of Oral Argument at 34, 548 U.S. 140 (2006)(No. 05-352))); Stephen J. Schulhofer & David D. Friedman, Rethinking Indigent Defense: Promoting Effective Representation Through Consumer Sovereignty and Freedom of Choice for All Criminal Defendants, 31 AM. CRIM. L. REV. 73, 109–10 (1993); Peter W. Tague, An Indigent's Right to the Attorney of his Choice, 27 STAN. L. REV. 73 (1974).

The Supreme Court has not articulated a rationale why indigent defendants have no right to choose their attorney, but it apparently stems from a concern for attorney autonomy: "[A] defendant may not insist on representation by an attorney he cannot afford or who for other

reasons declines to represent the defendant." <u>Wheat v. United States</u>, 486 U.S. at 159. One might also worry that allowing indigent defendants to choose their attorney would threaten the public purse by forcing the government to pay for top tier representation, <u>e.g.</u>, Johnnie Cochran, in every case. <u>See</u> <u>Luis v. United States</u>, 136 S. Ct. at 1089 ("[A]n indigent defendant, while entitled to adequate representation, has no right to have the Government pay for his preferred representational choice."). When he was a judge on the United States Court of Appeals for the Seventh Circuit, Professor Richard Posner articulated an explanation sounding in law and economics: "The services of the criminal defense bar cannot be auctioned to the highest bidder among the indigent accused-by definition, indigents are not bidders. But these services must be allocated somehow; indigent defendants cannot be allowed to paralyze the system by all flocking to one lawyer." <u>United States v. Ely</u>, 719 F.2d 902, 905 (7th Cir. 1983).

Attorney autonomy, funding constraints, and resource-allocation concerns fail to explain, however, why indigent criminal defendants should not be able to choose -- subject to the same constraints that apply to non-indigent defendants, <u>i.e.</u>, a trial judge's ability to "deem a chosen lawyer to be unqualified to handle the case, unavailable to proceed in a timely manner without disrupting the court's docket, or unable to cure a conflict of interest," Moore, <u>supra</u> 91 WASH. L. REV. at 1710-11 -- their counsel from among those attorneys willing to take their case at the generally applicable rates for appointed counsel under the Criminal Justice Act, 18 U.S.C. § 3006A(d), or analogous state legislation. The Court is reluctant to say that the Sixth amendment requires the government to give indigent defendants that right, but, as a matter of public policy, such a right would not threaten attorney autonomy, because an indigent criminal defendant could select only a lawyer willing to take the case. Nor would such a right threaten the public purse, because a defendant-chosen lawyer would be compensated at the same rate --

and with the same total-expense constraints, see 18 U.S.C. § 3006A(d)(2) -- as a government-appointed lawyer.  Defense lawyers' willingness to take particular cases, or the lack thereof, and the "mundane case-management considerations" that restrict any criminal defendant's "right to be represented by counsel of choice" would address resource-allocation concerns:

> If a trial judge schedules a trial to begin on a particular date and defendant's counsel of choice is already committed for other trials until some time thereafter, the trial judge has discretion under appropriate circumstances to refuse to postpone the trial date and thereby, in effect, to force the defendant to forgo counsel of choice.

United States v. Gonzalez-Lopez, 548 U.S. at 155.

The Supreme Court has, in fact, recognized that indigent criminal defendants have a limited right to determine who represents them in narrow circumstances where such a right does not threaten the ability of lawyers to choose their clients.  An indigent criminal defendant has the right to be represented by an attorney who is willing to take the case pro bono and not by a court-appointed attorney.  See United States v. Gonzalez-Lopez, 548 U.S. at 144 ("'[T]he Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney . . . who is willing to represent the defendant even though he is without funds.'"  (quoting Caplin & Drysdale, Chartered v. United States, 491 U.S. at 624-25)).  Likewise, indigent defendants are entitled to refuse the assistance of appointed counsel and, instead, to represent themselves.  See Faretta v. California, 422 U.S. 806, 807 (1975)(Stewart, J.).

**3.      Waiver of Conflicts of Interest.**

It is possible for a criminal defendant to waive his or her right, under the Sixth Amendment, to conflict-free counsel.  See Mickens v. Taylor, 535 U.S. at 173 ("In those cases where the potential conflict is in fact an actual one, only inquiry will enable the judge to avoid all

possibility of reversal by either seeking waiver or replacing a conflicted attorney."). See also Peretz v. United States, 501 U.S. 923, 936 (1991)("The most basic rights of criminal defendants are . . . subject to waiver."); United States v. Hunt, 62 F. App'x 272, 276 (10th Cir. 2003)(unpublished)("Nevertheless, a defendant may knowingly and intelligently waive the right to conflict-free counsel."). To effect a valid waiver, a trial court should "affirmatively participate in the waiver decision by eliciting a statement in narrative form from the defendant indicating that he fully understands the nature of the situation and has knowingly and intelligently made the decision to proceed with the challenged counsel." United States v. Winkle, 722 F.2d at 611 (citations omitted). A district court "should also determine whether the defendant understands the facts underlying the conflict and the dangers and risks associated with waiving the conflict." United States v. Hunt, 62 F. App'x at 276 (citing Eden v. Hannigan, 87 F.3d 1109, 1118 (10th Cir. 1996)). Where a colloquy does not reflect that the defendant understood those risks, and knowingly and intelligently waived the conflict, the Tenth Circuit has held that there is a Sixth Amendment violation where the conflict adversely affected counsel's performance. See Eden v. Hannigan, 87 F.3d at 1112, 1118.

A court can, however, "decline a proffer of waiver, and insist that defendants be separately represented." United States v. Wheat, 486 U.S. at 162. Courts can refuse proffered waivers "not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." Wheat v. United States, 486 U.S. at 163. The Supreme Court explained that,

> while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to

ensure that a defendant will inexorably be represented by the lawyer whom he prefers.

Wheat v. United States, 486 U.S. at 159. Accordingly the defendants' "right to choose their own counsel is circumscribed in several important respects." Wheat v. United States, 486 U.S. at 159. One such limitation on a defendant's right to counsel of their choice is a federal court's "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Wheat v. United States, 486 U.S. at 160. See United States v. McKeighan, 685 F.3d at 968 ("Courts have the duty to 'balance a defendant's constitutional right to retain counsel of his choice against the need to maintain the highest standards of professional responsibility, the public's confidence in the integrity of the judicial process and the orderly administration of justice.'" (quoting United States v. Collins, 920 F.2d 619, 626 (10th Cir. 1990))). Permitting defendants to proceed with conflicted counsel "'is also detrimental to the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings in his own court.'" United States v. Wheat, 486 U.S. at 162 (quoting United States v. Dolan, 570 F.2d 1177, 1184 (3d Cir. 1978)).

## ANALYSIS

1995 was an eventful year. Pixar released its first film: Toy Story. Yahoo was founded. Cal Ripken Jr. broke the record for all-time consecutive games played. Relevant to this case, in 1995, Mr. Blackburn represented J. Garcia in a murder trial. Two decades later -- after Derek Jeter played his entire career, Apple released ten iPhone iterations, and cinephiles watched eight new James Bond films -- the grand jury returned the Indictment charging A. Garcia in this case. See Indictment at 2.

This case and J. Garcia's 1995 state case have very little in common. Most importantly, J. Garcia's 1995 convictions have nothing to do with the SNM. <u>See</u> April Tr. at 16:4-6 (Blackburn)("[The murder] involves a gang matter, of which wasn't SNM, but for which he went to prison on."); <u>id.</u> at 147:4-5 (Beck)("[W]e don't take the position that this was an SNM-related murder."). Thus, the issue now before the Court is very different from the conflict-of-interest issue that the Court confronted in <u>United States v. DeLeon</u> that led the Court to disqualify a defense attorney who previously represented a government witness in an SNM-related murder. <u>See</u> <u>United States v. DeLeon</u>, 291 F. Supp. 3d at 1311-12. The Court, consequently, will not disqualify Mr. Blackburn.

I.    **MR. BLACKBURN'S CAN CONTINUE TO REPRESENT A GARCIA WITHOUT OFFENDING THE NEW MEXICO RULES OF PROFESSIONAL CONDUCT.**

Under New Mexico's ethical rules, an attorney cannot represent someone if the attorney formerly represented another client in the "same or a substantially related matter in which that [client]'s interest are materially adverse to the interests of the former client." N.M. Prof'l Conduct 16-109(A). Whether two cases are the same or a substantially related matter is a fact-bound inquiry. <u>See</u> N.M. R. Prof'l Conduct 16-109 cmt. 2 ("The scope of a 'matter' for purposes of this rule depends on the facts of a particular situation or transaction."). Matters are substantially related if: (i) "they involve the same transaction or legal dispute"; or (ii) "there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." N.M. R. Prof'l Conduct 16-109 cmt. 3.[5] New Mexico ethical rules also

---

[5]The comment's full text reads:

Matters are "substantially related" for purposes of this rule if they involve the

prevent an attorney from "reveal[ing] information relating to the representation," N.M. R. Prof'l

Conduct 16-109(C)(2), or from "us[ing] information relating to the representation to the

disadvantage of the former client" except "when the information has become generally known."

N.M. R. Prof'l Conduct 16-109(C)(1).

Mr. Blackburn's prior representation of J. Garcia had nothing to do with the SNM or A.

Garcia, so it is not "the same . . . matter" as this case.  N.M. R. Prof'l Conduct 16-109(A).

Likewise, J. Garcia's state-court murder, evidence-tampering, and firearm possession case does

not involve "the same transaction or legal dispute" as this case, a federal prosecution under the

---

same transaction or legal dispute or if there otherwise is a substantial risk that
confidential factual information as would normally have been obtained in the
prior representation would materially advance the client's position in the
subsequent matter.  For example, a lawyer who has represented a businessperson
and learned extensive private financial information about that person may not
then represent that person's spouse in seeking a divorce.  Similarly, a lawyer who
has previously represented a client in securing environmental permits to build a
shopping center would be precluded from representing the neighbors seeking to
oppose rezoning of the property on the basis of environmental
considerations.  However, the lawyer would not be precluded, on the grounds of
substantial relationship, from defending a tenant of the completed shopping center
in resisting eviction for nonpayment of rent.  Information that has been disclosed
to the public or to other parties adverse to the former client ordinarily will not be
disqualifying.  Information acquired in a prior representation may have been
rendered obsolete by the passage of time, a circumstance that may be relevant in
determining whether two representations are substantially related.  In the case of
an organizational client, general knowledge of the client's policies and practices
ordinarily will not preclude a subsequent representation.  On the other hand,
knowledge of specific facts gained in a prior representation that are relevant to the
matter in question ordinarily will preclude such a representation.  A former client
is not required to reveal the confidential information learned by the lawyer in
order to establish a substantial risk that the lawyer has confidential information to
use in the subsequent matter.  A conclusion about the possession of such
information may be based on the nature of the services the lawyer provided the
former client and information that would in ordinary practice be learned by a
lawyer providing such services.

N.M. R. Prof'l Conduct 16-109 cmt. 3.

Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961-1968 ("RICO"). N.M. R. Prof'l Conduct 16-109 cmt. 3. In 1995, J. Garcia murdered a man named Tony Lucero and then hid the gun he used to commit the crime. See State Trial Record at 1-2. The Lucero murder was not SNM related. See April Tr. at 16:4-6 (Blackburn); id. at 147:4-5 (Beck). Thus, the 1995 convictions would not be evidence of the RICO elements that the United States needs to prove. See 18 U.S.C. § 1962(c)-(d). The Lucero murder, for example, does not show that the SNM is an enterprise. See 18 U.S.C. § 1962(c); Boyle v. United States, 556 U.S. 938, 944 (2009)("[A]n enterprise includes any union or group of individuals associated in fact."). Nor does it show that SNM members agreed to engage in a pattern of racketeering activity. See 18 U.S.C. § 1962(d). Similarly, J. Garcia's 1995 conviction is not relevant to any of the overt acts that the United States has alleged. See Indictment at 10-53. The only 1994 and 1995 overt acts involve Defendants Manuel Jacob Armijo, Daniel Sanchez, and Christopher Garcia, so J. Garcia's actions in 1994-95 are not relevant. See Indictment 11-12.

Nevertheless, one representation may be substantially related to another if there "is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." N.M. R. Prof'l Conduct 16-109(A) cmt. 3. There is not, however, a substantial risk that confidential factual information that Mr. Blackburn learned while representing J. Garcia will materially advance A. Garcia's position in this case. Any information that Mr. Blackburn learned while representing J. Garcia is valuable for A. Garcia's defense -- if at all -- only as potential impeachment evidence regarding J. Garcia. That value, however, is not all that

significant, because many other avenues for impeaching J. Garcia exist,[6] and there is no

indication that impeaching J. Garcia will be particularly important to A. Garcia's defense, i.e.,

there is no indication that J. Garcia's testimony will be particularly damning vis-à-vis A. Garcia.

Additionally, J. Garcia's 1995 convictions are either inadmissible under rule 609(b) or

the United States will introduce those convictions during its direct examination of J. Garcia.  See

Fed. R. Evid. 607 ("Any party, including the party that called the witness, may attack the

witness's credibility.").  Both alternatives ensure that inquiring into the facts underlying J.

Garcia's conviction to attack J. Garcia's character for truthfulness is not permissible.  See United

States v. Albers, 93 F.3d 1469, 1479-80 (10th Cir. 1996); United States v. DeLeon, _ F. Supp. 3d

_, 2018 WL 1897613, at *2 (D.N.M. 2018)(Browning, J.)("[I]f the party calling a witness brings

out that witness' criminal conviction during direct examination, cross examination regarding the

facts underlying that conviction is not permissible notwithstanding rule 608(b) of the Federal

Rules of Evidence."); United States v. DeLeon, No. CR 15-4268, 2018 WL 2208300, at *3 n.5

(D.N.M. May 14, 2018)(Browning, J.)("[W]hen rule 609 renders a conviction inadmissible to

attack a witness' character for truthfulness, rule 608(b) inquiry into the facts underlying the

conviction is not permissible.").  Foreclosing rule 608(b) inquiry into the facts underlying J.

Garcia's conviction means that it is less likely that any information Mr. Blackburn has regarding

those facts will advance A. Garcia's position in this case.  Further, the age of any impeachment

information that Mr. Blackburn gained while representing J. Garcia weakens its probative force.

---

[6]For example, evidence available to the defense demonstrates that, in March, 2018, J. Garcia made statements under oath inconsistent with prior statements to the FBI, which has led to a perjury indictment.  See Draft Transcript of Motion Proceedings at 294:7-11 (taken March 15, 2018)(Beck, Garcia); Draft Transcript of Motion Proceedings at 5:1-4 (taken March 16, 2018)(Beck, Garcia); id. at 7:12-18 (Beck); id. 8:14-15 (Court); id. at 9:7-14 (Beck, Castle, Garcia); id. at 9:25-10:1 (Garcia); United States v. Garcia, No. 18-0933, Indictment (Doc. 2); United States v. DeLeon, No. 15-4268, Interview at 1-5, filed March 9, 2018 (Doc. 1909-1).

See N.M. R. Prof'l Conduct 16-109 cmt. 3 ("Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related."). See also N.M. R. Prof'l Conduct 16-109(a) cmt. 3 ("Matters are 'substantially related' for purposes of this rule if . . . there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." (emphasis added)).

Finally, appointing an additional attorney, Ms. Udall,[7] to cross examine J. Garcia minimizes the risk that Mr. Blackburn will use "information relating to the representation [of J. Garcia] to the disadvantage[8] of the former client," i.e. J. Garcia, N.M. R. Prof'l Conduct 16-

_____

[7]An additional attorney is necessary even though two court-appointed attorneys already represent A. Garcia in this case. The Court asked Scott Davidson, Mr. Blackburn's co-counsel, if he could cross-examine J. Garcia at trial. Mr. Davidson said that had not walled himself off from Mr. Blackburn's information regarding J. Garcia, but Mr. Davidson indicated that he does not recall learning any confidential information about J. Garcia. Mr. Davidson expressed concern, however, that J. Garcia's direct examination could refresh his recollection regarding that sort of confidential information. Out of an abundance of caution, the Court will assume that Mr. Davidson cannot ethically cross examine J. Garcia.

Given that Mr. Davidson and Mr. Blackburn cannot ethically cross examine J. Garcia, the Court has approached Cari Waters -- the United States Court of Appeals for the Tenth Circuit's Criminal Justice Act attorney -- about appointing another attorney to cross examine J. Garcia. Ms. Waters said that the Court has the authority and power appoint such an attorney, and that she will find the money to appoint another lawyer. The Court has exhausted the supply of lawyers that it could appoint who practice in New Mexico and the El Paso area. A. Garcia's team has contacted Marc Lowry and Theresa Duncan, counsel for Defendant Anthony Baca in both United States v. DeLeon and in this case, about lawyers in the Phoenix, Arizona area. Mr. Blackburn has reached out to Laura Udall of Phoenix, Arizona. The Court will appoint Ms. Udall if she agrees to the appointment. Mr. Blackburn says that he does not have a brief writer in this case, and expects to use Mr. Davidson sparingly. The Court will also expect that, if it is going to appoint another counsel for A. Garcia, Mr. Davidson's role should gradually diminish, if not disappear.

[8]The New Mexico Rules of Professional Conduct do not define disadvantage. Given that rule 16-109(C) is an extension of rule 16-106's duty of confidentiality -- one of the strictest

- 28 -

109(C)(1), or reveal that information, <u>see</u> N.M. R. Prof'l Conduct 16-109(C)(2). While Mr.

Blackburn probably learned confidential information while representing J. Garcia, Ms. Udall

cannot use or reveal information she does not have. To the extent that Mr. Blackburn's inability

to cross examine J. Garcia or to assist Ms. Udall in preparing that cross examination creates "a

concurrent conflict of interest" by limiting Mr. Blackburn's ability to represent A. Garcia, N.M.

R. Prof'l Conduct 16-107(A), A. Garcia can waive that conflict, <u>see</u> N.M. R. Prof'l Conduct 16-

107(B). Accordingly, the New Mexico Rules of Professional Conduct and the District of New

Mexico Local Rules do not mandate Mr. Blackburn's disqualification. <u>See</u> D.N.M. LR-Cr R.

57.2.[9]

---

ethical rules to which an attorney must adhere -- the Court concludes that disadvantage must be interpreted strictly in the client's favor. <u>See</u> N.M. R. Prof'l Conduct 16-106 cmt. 22. Thus, the Court interprets disadvantage a client to encompass impeaching a client on cross-examination

[9]Accordingly, this case contrasts with <u>United States v. DeLeon</u> in which the Court ultimately concluded that Michael Davis, an attorney, did not represent Carlos Herrera, an alleged SNM member. <u>See</u> <u>United States v. DeLeon</u>, 291 F. Supp. at 1310-13. Herrera and a man named Roy Paul Martinez, among others, are, purportedly, leaders of the SNM enterprise. <u>See</u> <u>United States v. DeLeon</u>, No. 15-4268, Superseding Indictment ¶ 10, at 6 (Doc. 946)("DeLeon Indictment"). Counts 6 and 7 of the DeLeon Indictment allege that Herrera conspired to murder and murdered a man named Javier Molina, and Counts 9 and 10 of the DeLeon Indictment allege that Martinez conspired to murder men named Dwayne Santistevan and Gregg Marcental. <u>See</u> DeLeon Indictment at 12-15. In <u>United States v. DeLeon</u>, Mr. Davis had been appointed to represent Herrera, but had previously represented Martinez in a 2002 state trial for strangling an inmate in retaliation for an SNM-related grievance. <u>See</u> <u>United States v. DeLeon</u>, 291 F. Supp. 3d at 1292. Martinez pled guilty to counts 9 and 10 in <u>United States v. DeLeon</u>, and the United States planned to call Martinez as a witness, believing it likely that Martinez would testify about his 2002 conviction. <u>See</u> <u>United States v. DeLeon</u>, 291 F. Supp. 3d at 1293. Given that the 2002 strangling was an SNM-ordered hit, the Court concluded that Martinez' "[t]estimony regarding that murder is probative regarding both of the existence of the SNM as an enterprise and of the SNM's engagement in racketeering activity." <u>United States v. DeLeon</u>, 291 F. Supp. 3d at 1312. Thus, the Court determined that Mr. Davis' representation of Herrera in <u>United States v. Deleon</u> "involve[d] the same legal dispute" as his previous representation of Martinez, because Martinez' 2002 conviction could serve as evidence for the Violent Crimes in Aid of Racketeering elements that the United States needed to prove. <u>United States v. DeLeon</u>, 291 F. Supp. 3d at 1211. In contrast, here, as already explained, testimony

II.   **EVEN THOUGH MR. BLACKBURN REPRESENTED J. GARCIA, HE CAN CONTINUE TO REPRESENT A. GARCIA WITHOUT VIOLATING THE SIXTH AMEMDEMENT IF A. GARCIA CONSENTS.**

The Court's analysis regarding New Mexico's ethical rules does not end the Court's inquiry, because A. Garcia has a constitutional right to conflict-of-interest-free counsel.  See Cuyler v. Sullivan, 446 U.S. 335, 348 (1980)("In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."); United States v. Gallegos, 108 F.3d 1272, 1280 (10th Cir. 1997).  See also Strickland v. Washington, 466 U.S. 668, (1984)("Prevailing norms of practice as reflected in American Bar Association standards and the like are guides to determining what is [constitutionally] reasonable, but they are only guides." (citation omitted)).[10]  There are two types of conflicts of interest: actual and potential.  See

_____

about the 1995 murder presents no such evidence of this RICO crime's underlying elements. Accordingly, the Court concludes that the 1995 case and the present case do not involve the same transaction or legal dispute.

[10]The United States cites Wood v. Georgia, 450 U.S. 261 (1981) for the proposition that Due Process also requires conflict-free counsel.  See Motion at 7, 10 (citing Wood v. Georgia, 450 U.S. at 269-70).  In Wood v. Georgia, the Supreme Court addressed whether employees who were represented at a probation hearing by an attorney who their employer hired were "deprived of federal rights under the Due Process Clause of the Fourteenth Amendment."  450 U.S. at 270. The Supreme Court applied the Sixth Amendment's conflict-of-interest rubric -- even though the Sixth Amendment does not apply to probation hearings -- because, in some cases "due process requires appointment of counsel for indigent offenders during revocation hearings," and "[w]here a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest."  Wood v. Georgia, 450 U.S. at 271.  See id. ("Petitioners would have had a right to appointed counsel if they had made the showing of indigence on which they now rely.").

Thus, Wood v. Georgia does not indicate that there is a free-standing Due Process Clause right to conflict-of-interest-free counsel.  Instead, a constitutional right to counsel -- no matter the particular provision that guarantees that right -- is more than just a right to the presence of "a person who happens to be a lawyer."  Strickland v. Washington, 466 U.S. at 685.  Instead, it is a right to the effective assistance of counsel, which includes "a duty of loyalty, a duty to avoid conflict of interests.  Strickland v. Washington, 466 U.S. at 688.

Wheat v. United States, 486 U.S. at 163.  "An actual conflict for Sixth Amendment purposes is a conflict of interest that adversely affects counsel's performance."  Mickens v. Taylor, 535 U.S. 162, 172 n.5 (2002).  See United States v. Perez, 325 F.3d at 125.  Such a conflict exists if "a specific and seemingly valid or genuine alternative strategy or tactic was available to defense counsel, but it was inherently in conflict with his duties to others or his own personal interests."  United States v. Bowie, 892 F.2d at 1500.  "An attorney has a potential conflict of interest if 'the interests of the defendant may place the attorney under inconsistent duties at some time in the future.'"  United States v. Perez, 325 F.3d at 125 (quoting United States v. Kliti, 156 F.3d 1350, 153 n.3 (2d Cir. 1998)).  See United States v. Flood, 713 F.3d 1281, 1286-87 (10th Cir. 2013)("In other words, there must be more than a potential conflict of interest or 'a mere theoretical division of loyalties.'")(quoting Mickens v. Taylor, 535 U.S. at 171)).  A defendant may waive his or her right to conflict-free counsel, but the Court has "substantial latitude in refusing waivers" not only when an "actual conflict may be demonstrated before trial," but also "in the more common cases where a potential for conflict exists, which may or may not burgeon into an actual conflict."  Wheat v. United States, 486 U.S. at 163-64.  See United States v. Hunt, 62 F. App'x at 276.[11]

---

[11]The United States contends that defendants cannot waive their Sixth Amendment right to conflict-of-interest-free counsel to vindicate their Sixth Amendment right to the counsel of their choice.  See Motion at 7 (citing United States v. Perez, 325 F.3d at 125-26 and Stephens v. United States, 595 F.2d 1066, 1067 (5th Cir. 1979)).  While "[a]n actual or potential conflict cannot be waived if, in the circumstances of the case, the conflict is of such a serious nature that no rational defendant would knowingly and intelligently desire that attorney's representation," there is no categorical rule stating that actual conflicts of interest are unwaivable.  United States v. Schwarz, 283 F.3d 76, 95 (2d Cir. 2002).  See id. ("In most cases when a defendant is faced with a situation in which his attorney has an actual or potential conflict of interest, it is possible for him to waive his right to conflict-free counsel in order to retain the attorney of his choice.");  id. at 95-96 ("Where an actual or potential conflict has been validly waived, the waiver cannot be defeated simply because the conflict subsequently affects counsel's performance; such a result

Here, there is no actual or potential conflict of interest, because the Court will appoint Ms. Udall to conduct J. Garcia's cross examination, which ensures that Mr. Blackburn's prior representation of J. Garcia will not adversely affect A. Garcia's representation. Mr. Blackburn's continuing duties to J. Garcia mean that he cannot ethically cross examine A. Garcia for fear of using or revealing J. Garcia's confidential information contrary to rule 16-109(C) of the New Mexico Rules of Professional Conduct. That Ms. Udall does not share Mr. Blackburn's conflict of interest means that she can fully cross examines J. Garcia, so Ms. Udall's appointment cures any adverse effect Mr. Blackburn's conflict of interest would otherwise cause.

Even if the Court did not appoint Ms. Udall, Mr. Blackburn's prior representation of J. Garcia would not raise an actual or serious potential conflict of interest. The most likely way that Mr. Blackburn's duties to J. Garcia would conflict with Mr. Blackburn's duties to A. Garcia is that Mr. Blackburn might have confidential information relating to J. Garcia's 1995 convictions which would assist Mr. Blackburn during J. Garcia's cross-examination. See Fed. R. Evid. 608(b)(permitting inquiry -- but not extrinsic evidence -- regarding "specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness"). "[T]here is no per se rule prohibiting representation of the defendant by counsel who has previously represented a government witness in a related case." United States v. Bowie, 892 F.2d at 1502. See Hernandez v. Mondragon, 824 F.2d 825, 826-27 (10th Cir. 1987). Of most concern to the Tenth Circuit is that an attorney's prior representation might "foreclose[] a

---

would eviscerate the very purpose of obtaining the waiver."). See also United States v. Migliaccio, 34 F.3d 1517, 1527 (10th Cir. 1994)("Where an actual conflict exists and is brought to the court's attention, the court's participation is integral to a valid waiver."); United States v. Hunt, 62 F. App'x at 276 (noting that a district court has latitude to refuse a proffered waiver -- and, implicitly, to accept it -- in cases where an actual conflict of interests exist).

specific and seemingly valid or genuine strategy or tactic in handling of this witness." United States v. Bowie, 892 F.2d at 1500. The Tenth Circuit has not exhibited concern associated with extraneous instances of a witness' conduct:

> Inquiry into specific instances of a witness' veracity can bog down a trial in distracting and confusing side issues. Even in cases in which defense counsel actually represented the government witness in the prior case, the conflict-of-interest claim can only succeed if there is a substantial and particular relationship between the two cases. A collateral incident relevant only to witness credibility does not satisfy this prerequisite.

United States v. Bowie, 892 F.2d at 1501 (citations omitted). See United States v. Roach, 912 F. Supp. 2d at 1168 (interpreting United States v. Bowie to mean that "the potential for conflict is great in a successive-representation case where there is a substantial relationship between the cases"). Although the Tenth Circuit's musings on this issue are dicta,[12] -- the attorney allegedly

---

[12]The Tenth Circuit's holding as to this portion of United States v. Bowie is that there is no actual conflict when an attorney does not explore collateral impeachment material admissible under 608(b) if that impeachment material would have "implicated defense counsel in wrongdoing." United States v. Bowie, 892 F.2d at 1500-01. There is some tension between the Tenth Circuit's holding and the standard it quotes. See United States v. Bowie, 892 F.2d at 1500-1501. On the one hand, the Tenth Circuit says that an actual conflict exists when a "specific and seemingly valid or genuine alternative strategy or tactic" is available to counsel, but that strategy or tactic is "inherently in conflict with his duties to others or to his own personal interest"; on the other, the Tenth Circuit holds that, if a witness-impeachment strategy is available, but the attorney foregoes that strategy, as it implicates the attorney in wrongdoing, there is no actual conflict. It would seem that impeaching a witness on a collateral matter was a valid or genuine strategy in United States v. Bowie, but pursuing that strategy conflicted with that attorney's personal interest.

There are two plausible ways to resolve that tension. First, the Tenth Circuit suggests that impeaching a witness on a collateral matter is not a "seemingly valid or genuine alternative strategy or tactic," because a district court has discretion to bar cross-examination on any collateral matter. United States v. Bowie, 892 F.2d at 1500-01 ("But, in any event, the district court would have been well within its discretion to forbid any inquiry into this incident."). See Fed. R. Evid. 608(b) ("[T]he court may, on cross-examination, allow [specific instance's of a witness' conduct] to be inquired into if they are probative of the character for truthfulness.")(emphasis added). As articulated above, see supra n.9, the Court determines that this reasoning is suspect, because many district courts might be inclined to allow rule 608(b)

subject to a conflict of interest in <u>United States v. Bowie</u> had not previously represented a

prosecution witness -- the Tenth Circuit's unequivocal language is instructive.  J. Garcia's 1995

case has no relationship to the present case, let alone "a substantial and particular relationship" to

it.  <u>United States v. Bowie</u>, 892 F.2d at 1501.  Accordingly, even if Mr. Blackburn were to cross

examine J. Garcia about specific instances of misconduct arising from the 1995 case, that would

not raise an actual or serious potential conflict of interest reaching constitutional proportions.

    In any event, A. Garcia can waive Mr. Blackburn's conflict of interest, which cures any

conflict-of-interest issues that arise from A. Garcia's Sixth Amendment right to counsel.[13]  <u>See</u>

---

material on a crucial witness.  Thus, depending on the circumstances, an advocate might have a
valid and genuine strategy to seek admission of rule 608(b) evidence.
    The second way to resolve the tension centers on the potential probative value of the
testimony.  The more likely the testimony is probative, the more likely there is an actual conflict.
The Court determines that this conclusion plausibly resolves the tension, because the Tenth
Circuit would otherwise have no reason to suggest that the relationship between the present and
prior cases affects whether an actual conflict exists.  <u>See</u> <u>United States v. Bowie</u>, 892 F.2d at
1501 ("[T]he conflict-of-interest claim can only succeed if there is a substantial and particular
relationship between the two cases.").  <u>See</u> <u>also</u> <u>Church v. Sullivan</u>, 942 F.2d 1501, 1511 n.8
(10th Cir. 1991)(noting that the actual-conflict analysis turns on whether there  is "a close
connection between the two representations").  This reasoning likewise falls in line with the New
Mexico ethical rules.  N.M. R. Prof'l Conduct 16-109(A) cmt. 3 (noting that materiality affects
the analysis).  The Court concludes, accordingly, that this second line of thinking is the more
plausible reasoning that ultimately informs the Tenth Circuit's analysis in <u>United States v.</u>
<u>Bowie</u>.

    [13]A. Garcia may not unilaterally waive Mr. Blackburn's duties to J. Garcia under rule 16-
109 of the New Mexico Rules of Professional Conduct.  <u>See</u> N.M. R. Prof'l Conduct 16-109 cmt.
9 ("The provisions of this rule are for the protection of former clients and can be waived if the
[former] client gives informed consent . . . .").  To the extent that Mr. Blackburn's obligations to
J. Garcia hamper his representation of J. Garcia, A. Garcia can unilaterally waive that conflict of
interest.  <u>See</u> N.M. R. Prof'l Conduct 16-107(A)("[A] lawyer shall not represent a client if the
representation involves a concurrent conflict of interest."); <u>id.</u> (stating that a concurrent conflict
of interest exists "if there is a significant risk that the representation of one or more clients will
be materially limited by the lawyer's responsibilities to another client, a former client or a third
person or by a personal interest of the lawyer"); <u>id.</u> N.M. R. Prof'l Conduct 16-
107(B)("Notwithstanding the existence of a concurrent conflict of interest . . . a lawyer may
represent a client if . . . each affected client gives informed consent, confirmed in writing.").

United States v. Gallegos, 108 F.3d 1272, 1281 (10th Cir. 1997). The Court does not need to secure a waiver unless an actual conflict exists, but it can secure a waiver when a potential conflict comes to its attention. See United States v. Gallegos, 108 F.3d 1272, 1282 (10th Cir. 1997); United States v. Roach, 912 F. Supp. 2d at 1177. The defendant's waiver must be voluntary, knowing, and intelligent. See United States v. Schneider, 704 F.3d 1287, 1292 (10th Cir. 2013).

> [I]n order for a defendant effectively to waive his right to conflict-free counsel, the trial judge should affirmatively participate in the waiver decision by eliciting a statement in narrative form from the defendant indicating that he fully understands the nature of the situation and has knowingly and intelligently made the decision to proceed with the challenged counsel.

United States v. Schneider, 704 F.3d at 1292. "[W]hen determining if a waiver is valid, we consider the totality of the circumstances, including all prior discussions of any conflict." United States v. Schneider, 704 F.3d at 1292 (concluding a valid waiver of potential conflicts occurred when the district court stated the United States' concerns on the record and allowed the clients opportunity to confer with counsel before securing an oral waiver). Given that the Court will appoint Ms. Udall to represent A. Garcia, he can obtain legal advice from a lawyer who does not share Mr. Blackburn's obligations to J. Garcia regarding whether to waive Mr. Blackburn's conflict-of-interest issues associated with Mr. Blackburn's prior representation of J. Garcia. See United States v. Roach, 912 F. Supp. 2d at 1176. The Court will hold a colloquy once new counsel is secured and, should A. Garcia voluntarily, knowingly, and intelligently decide to waive those conflicts, it will require "a written waiver indicating that independent counsel" advised him about "the implications of such a waiver." United States v. Roach, 912 F. Supp. 2d at 1177.

Mr. Blackburn may have gained other information, apart from information regarding the

facts underlying J. Garcia's 1995 conviction, that would be useful for impeaching J. Garcia. For example, as a gang member, J. Garcia may have had several occasions to lie, see United States v. Abel, 469 U.S. 45, 47 (1984)(noting that membership in the Aryan Brotherhood requires its members to lie about the gang's existence); United States v. DeLeon, No. 4268, Draft Transcript of Trial Proceedings at 20:13-20 (taken February 7, 2018)(Armijo, Rodriguez)(asserting that SNM members are supposed to lie about their SNM membership). Inquiry into those instances would be relevant and admissible under rule 608(b), because those hypothetical instances of J. Garcia's conduct have not resulted in a conviction. There is no indication, however, that such Mr. Blackburn actually has any such information, and that information's age as well as the existence of other avenues for impeaching J. Garcia mean that, even if Mr. Blackburn has this sort of information, its usefulness vis-à-vis A. Garcia's defense is marginal at best. Consequently, that Mr. Blackburn may possess this sort of information does not require the Court to disqualify Mr. Blackburn.

**IT IS ORDERED** that the United States' Sealed Motion Regarding Attorney Conflict, filed April 30, 2018 (Doc. 599), is granted in part and denied in part on the conditions that the Court secure new counsel for Arnulfo Garcia to cross-examine James Garcia and that Arnulfo Garcia waives potential conflicts. Provided the Court finds new counsel and secures a waiver, it will not disqualify Billy Blackburn from his representation of Arnulfo Garcia. Should James Garcia testify, Billy Blackburn will be walled off from James Garcia's cross-examination. The Court will hold a colloquy with Arturo Garcia about waiver of potential conflicts once Arturo Garcia has new counsel.

_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

Fred Federici
  Attorney for the United States
    Acting Under Authority Conferred by 28 USC § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

      _Attorneys for the Plaintiff_

Theresa M. Duncan
Duncan, Earnest, LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

      _Attorneys for Defendant Anthony Ray Baca_

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

>    *Attorneys for Defendant Christopher Garcia*

Todd Bruce Hotchkiss
Todd B. Hotchkiss, Attorney at Law, LLC
Albuquerque, New Mexico

>    *Attorney for Manuel Jacob Armijo*

Louis E. Lopez, Jr.
El Paso, Texas

>    *Attorney for Frederico Munoz*

Donald F. Kochersberger, III-
Business Law Southwest, LLC

>    *Attorney for Sergio Loya Rodriguez*

Susan Burgess-Farrell
Barry G. Porter
Burges & Porter Law, LLC
Albuquerque, New Mexico

>    *Attorneys for Manuel Benito*

Diego R. Esquibel
The Barnett Law Firm
Albuquerque, New Mexico

--and--

R. Scott Reisch
Reisch Law Firm, LLC
Denver, Colorado

>    *Attorneys for Vincent Garduno*

Marc Grano
Grano Law Offices
Las Vegas, New Mexico

     *Attorney for Mandel Lon Parker*

James Baiamonte
Albuquerque, New Mexico

--and--

Ahmad Assed
Ahmad Assed & Associates
Albuquerque, New Mexico

     *Attorneys for Daniel Archuleta*

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

     *Attorneys for Defendant Daniel Sanchez*

Marcia A. Morrissey
Santa Monica, California

--and--

Gregory M. Acton
Albuquerque, New Mexico

     *Attorneys for Anthony Cordova*

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

*Attorneys for Defendant Arturo Arnulfo Garcia*